Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 80 C 5124 | **DATE** | 12/7/2004 |
| **CASE TITLE** | United States of America vs. Board of Education of the City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** The motion (Doc 1114-1) of the United States to enforce the March 1, 2004, modified consent decree is granted as discussed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | DEC 8 - 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 1119 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SCT | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 80 C 5124 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Plaintiff United States of America to enforce certain provisions of the modified consent decree ("MCD") entered in this case on March 1, 2004. For the reasons set forth below, the motion is granted as discussed.

### DISCUSSION

This is the second time that the United States has moved to enforce the consent decree since its entry less than a year ago. The motion contends that the Board of Education of the City of Chicago ("the Board") has failed to honor its desegregation obligations under the MCD for the current school year in two areas: majority-to-

minority ("M-to-M") transfers[1] and allocation of desegregation funds. In its response, the Board contests the underlying argument that it has not fully complied with the provisions of the MCD in both areas. Amici curiae the American Civil Liberties Union, the Chicago Lawyers' Committee for Civil Rights Under Law, and the Mexican-American Legal and Educational Defense Fund have contributed their perspective on the current situation and agree in substance with the position of the United States. However, they suggest that essential data is absent in some key areas and advocate a discovery process to provide the missing information.

**1. M-to-M Transfers**

With respect to the first area of contention, the United States claims that the Board has allowed 775 white students to transfer into schools whose student population is already more than 50% white. The motion asserts that, under ¶ I(E)(1) of the MCD, these seats should instead have been offered for M-to-M transfers. By contrast, from a starting point of the 801 seats that were vacant in schools with 50% white student enrollment at the beginning of the 2004-2005 school year, the Board subtracts groups of transferring students through various rationales and ultimately represents that no

---

[1] A majority-to-minority transfer allows a student to transfer from a school in which he or she is in the racial or ethnic majority to one in which he or she is in the ethnic minority. MCD ¶ I(E)(2)(b).

seats are left to be taken by M-to-M transfers. The amici contend that the number of available seats approaches 2,000.

The vast disparity between the various calculations of the number of available seats convinces the court that we cannot achieve a complete understanding of the fundamental underpinnings of the dispute and come to an independent conclusion of a complete remedy without extensive, expensive, and time-consuming discovery that would culminate in a full-blown evidentiary hearing. This proceeding would surely cover ground that would be covered again in the hearings we have scheduled on the continuing viability of the consent decree as a whole at the end of the 2005-2006 school year. Besides the likelihood that this process would result in duplicative and therefore wasteful effort, the time required to allow the parties to properly complete it would undoubtedly take us well beyond the end of this school year, rendering moot any relief deemed necessary after such a proceeding.

However, even without enabling definitive factual findings, the submitted information strongly suggests that the Board is not complying with the terms of the MCD on the issue of M-to-M transfers–an unacceptable state of affairs. It goes without saying that compliance is not discretionary, but we cannot ignore the logistical

problems associated with transferring large numbers of students halfway through the school year.[2] The parties' submissions reveal a middle ground.

Though we cannot concretely quantify the space that could be used to accommodate M-to-M transfers during this school year, the Board acknowledges the existence of 83 seats that were offered to students under the No Child Left Behind Act and suggests that some students who were offered these seats did not choose to occupy them. In addition, the fourth page of the "Minority-to-Majority Study Analysis" provided as Exhibit C to the Board's brief states that a space utilization analysis performed by its Office of School Demographics and Planning should have been completed at the end of November 2004. According to the Board, the findings of this study enable it to conclusively determine what space is available for transfers.

To achieve a level of compliance that is feasible while minimizing the risk of wasteful effort, we order the Board to publicize by December 17, 2004, the availability of any of the 83 seats not already taken and any seats identified by the space utilization study that would satisfy the criteria for an M-to-M transfer by December 17, 2004. We also order that the Board honor any requests made for M-to-M transfers into those

---

[2] In addition, the amici support the idea of displacing white transfer students to make room for M-to-M transfers, a position not espoused by either the Board or the United States. Displacement of students in the middle of a school year may well create other unjust consequences.

spots that comply with other existing transfer policies not in conflict with the obligations of the consent decree. We stress that the Board is not required to displace students during the current school year. However, for the 2005-2006 school year, the Board must take affirmative and demonstrable steps to fill all available seats with M-to-M transfers before satisfying open enrollment transfers. In other words, we are not requiring mid-year displacement of students who currently occupy seats that should have been offered to M-to-M transfer students in the 2004-2005 school year, but seats that were provided to open enrollment students this year must be freed up for M-to-M transfers next year. This must occur even if students who transferred under open enrollment are displaced from their school of choice for this year.

## 2. Allocation of Funds

The second issue revolves around ¶ V(B) of the MCD, which addresses how desegregation funds will be spent. This portion of the decree establishes that the funds provided to the Board for desegregation efforts shall be devoted to four categories of activities: magnet schools, magnet clusters, compensatory and supplemental programs, and transportation. The provision addressing magnet clusters specifies, *inter alia*, that the amount of desegregation funds allocated to magnet cluster schools in a given year cannot exceed the amount of desegregation funds allocated to compensatory and supplemental programs for the same year. MCD ¶ V(B)(1)(d). According to the

United States, this year's allocations of desegregation funds are significantly disproportionate with respect to these two groups, with $40.1 million dedicated to magnet clusters and only $9.2 million spent on compensatory and supplemental programs.

In defense of its spending allocations, the Board contends that we must compare the total amount spent on compensatory and supplemental programs with the amount spent on magnet clusters rather than looking at the respective amounts of desegregation funds in isolation. Simply put, this rationale is fundamentally at odds with the plain language of the decree, which refer only to "desegregation funds" and give no indication that any other money spent on a program arguably assisting in the desegregation effort should be included within that term. In considering whether its allotment comports with ¶ V(B)(1)(d), the Board may not look at the entire universe of funds spent. The money specified as "desegregation funds" within the decree is the sole amount that can be taken into account in calculating parity of allocation.[3]

In light of this conclusion, we must consider the relief requested by the United States. The remedy sought for this school year recognizes the difficulty of displacing money already dispersed in the middle of a school year and seeks reallocation of an

---

[3] Of course, this does not imply that the Board cannot or should not spend money other than the desegregation funds on any of the programs mentioned within the MCD.

amount less than what the United States argues would constitute full compliance: $7.7 million. This figure is the sum of the amounts the United States contends were improperly allocated to magnet clusters that are not racially identifiable and to compensatory programs at schools that are not racially identifiable.

While, in principle, we agree with the interpretation of the MCD that desegregation funds should not be used at schools falling into these two categories, we cannot be certain that the schools the United States has identified are all properly classified. Exhibit 1 to the brief of the amici curiae contains the information derived from a race and ethnicity survey of the Chicago Public Schools for the 2003-2004 school year. According to that data, eight of the schools whose funding would be pulled under Exhibit 11 to the United States' reply are miscategorized (Hamilton, New Field, Abbott, Goudy, Casals, Irving, Ravenswood, and von Humboldt), making it improper to allow them to retain funds they have received or to disgorge funding to which they are entitled. While we recognize that these figures are apparently not the most current, the number of potentially affected schools gives us pause. Accordingly, we order the Board to realistically appraise its allocation of funds with respect to the current racial and ethnic makeup of its schools, consistent with the methodology expressed within the United States' briefs, and reallocate any amounts in accordance

with the interpretation of the MCD expressed above. This must be done in sufficient time for the changes to take effect for the second half of the current school year.

For the 2005-2006 school year, the Board must promulgate guidelines that provide for all the obligations in ¶ V(B)(1) and allocate the desegregation funds referenced within the MCD without respect to other monies that may be spent on the activities described in that section of the decree.

## CONCLUSION

The motion of the United States to enforce the March 1, 2004, modified consent decree is granted as discussed.

*Charles P. Kocoras*

Charles P. Kocoras
Chief Judge
United States District Court

Dated: DEC - 7 2004