**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, v. **BOARD OF EDUCATION OF THE CITYOF CHICAGO**, Defendant. | Civil Case No. 80 CV 5124 Honorable Charles P. Kocoras |

**RESPONSE OF AMICI CURIAE TO DEFENDANT BOARD OF
EDUCATION OF THE CITY OF CHICAGO'S SUPPLEMENTAL
POST-UNITARY STATUS HEARING BRIEF FILED IN LIGHT OF
THE RECENT U.S. SUPREME COURT DECISION IN *HORNE V. FLORES***

**INTRODUCTION**

On August 10, 2009, Defendant Chicago Board of Education (hereinafter "Board" or "CPS") filed a brief entitled Supplemental Post-Unitary Status Hearing Brief Filed in Light of the Recent U.S. Supreme Court Decision in *Horne v. Flores*[1] (hereinafter "Def. Supp. Br.") (Dkt. # 1348-2). In its filing, the Board stated that the *Horne* decision contained a number of "statements that substantiate" arguments previously asserted by the Board and urged this Court to vacate Amended Appendix C ("AAC") of the Second Amended Consent Decree ("SACD") which deals with services for English Language Learners ("ELLs"). Def. Supp. Br. at 1-2. For the reasons set forth below, *Amici* respectfully assert that neither the *Horne* decision nor the arguments advanced in the Board's recent filing support vacating AAC of the SACD.

Additionally, *Amici* urge this Court to deny the Board's request for unitary status due to unresolved issues related to magnet, gifted and selective enrollment schools

---

[1] *Horne v. Flores* involved a Rule 60(b)(5) motion which differs procedurally from the present case. *See Horne v. Flores*, No. 08-289, slip op. (June 25, 2009).

("MGSE Schools"), which include the Board's continued failure to present a plan for future admissions to MGSE schools, as well as a current federal investigation of the MGSE admissions practices. *Amici* also urge this Court to deny the Board's request for this Court to retain jurisdiction for a period of one year from the date of an order declaring unitary status for the purpose of addressing enrollment challenges.

## ARGUMENT

### I. A Substantial Federal Interest is Implicated in the SACD

The Board states that there is an "absence of a substantial federal interest" in the SACD because the SACD "is not founded on any allegation in the original, federal complaint" relating to the education of ELLs.[2] Def. Supp. Br. at 3. The Board further alleges, without providing any examples, that the SACD has restricted its ability "'to make basic decisions regarding educational policy, appropriations, and budget priorities.'" *Id.* at 2 (*quoting Horne v. Flores*, No. 08-289, slip op. at 10-11 n.3 (June 25, 2009)). These arguments are without merit.

As this Court is aware, from the beginning of this suit, the Original Consent Decree ("OCD") that was voluntarily entered into by the parties sought to develop a plan "to remedy the present effects of past segregation of black and Hispanic students." *See United States v. Bd. of Educ. of the City of Chicago,* 554 F.Supp. 912 at n.1 (N.D. Ill 1983). On February 11, 1983, the Court approved the desegregation plan ("Plan") and entered final judgment. *See United States v. Bd. Of Educ. of the City of* Chicago, No. 80

---

[2] As a matter of federalism, the Board also asserts that provisions of the SACD mirror state law to illustrate the federal/state comity issue. In any event, even if some requirements of the decree also appear in state law, that does not preclude them from being grounded in federal law and appropriately part of a remedial structure. The Board's argument that the SACD "mirrors state law requirements…with minor distinctions" (Def. Supp. Br. at 3) is the same argument it advanced in its April 25, 2008 60(b) motion (Dkt. # 1262) requesting that Section IV and AAC of the SACD be vacated which was denied on May 1, 2008. (Dkt. # 1265).

C 5124, slip op. (N.D. Ill. Feb. 11, 1983) (Ex. A).   The Plan was divided into three sections.   The first section, "Student Desegregation," had two objectives – to provide for the greatest number of stably desegregated schools and to implement compensatory programs to "provide educational and related programs for any Black or Hispanic schools remaining segregated."   *Id*. at 4.    The third section, "Other Matters," included a subsection entitled "Bilingual Programs" that required CPS to "implement a plan to ensure that non-and limited English speaking students are provided with the instructional services necessary to assure their effective participation in the educational programs of the Chicago School District."   *Id.* at 17.   It is evident that the OCD derived from claims of racial and national origin discrimination under Title VI of the 1964 Civil Rights Act and sought to provide equal educational opportunities for all students to remedy the effects of this discrimination, clearly implicating a substantial federal interest.

The Board also argues that the SACD has restricted its ability to make basic decisions regarding educational policy, yet it fails to provide any examples to support this argument.   The OCD, as well as the subsequent modified decrees entered into with the Board's consent, centered on monitoring CPS' delivery of ELL services.   The agreements did not seek to constrain the Board's ability to make decisions regarding educational policy, appropriations and budget priorities.   In fact, from the beginning, this Court afforded flexibility to the Board as it developed a plan, stating "the Board is free to adopt a plan within the 'broad range of constitutionally acceptable plans'."   *United States v. Bd. of Educ. of the City of Chicago,* 554 F.Supp. at 914.   Since the Board has failed to offer any examples to support its assertion that the SACD has hampered its ability to provide ELL services, this unsupported allegation should be disregarded.

## II. *Horne* Does Not Require The Board To Abandon Bilingual Education

The Board next argues that the Equal Educational Opportunities Act ("EEOA") is not implicated in this case and even if it was, it only requires "appropriate action" – a standard that does not require "any particular level of funding or methodology." Def. Supp. Br. at 3. The Board further argues that the Department of Justice is attempting to "micromanage" its efforts to "effectively 'transition' ELLs from native language instruction to a more broad-based array of English instruction," which presumably "runs afoul" of the Supreme Court's dicta in *Horne* which suggests that a "sheltered English immersion" approach for ELL instruction may be more effective. *Id.* at 4.

First, a proper reading of the *Horne* decision reveals that there is no conflict between the Supreme Court's decision and this case. The *Horne* Court criticized the Court of Appeals for engaging in a Rule 60(b)(5) inquiry that was too narrow and "focused almost exclusively on the sufficiency of incremental funding" – an entirely different factual and procedural situation from this case. *Horne*, No. 08-289 at 15. The Court held that a Rule 60(b)(5) motion, in the context of satisfying the EEOA, which the Board acknowledges is not implicated in this case, requires a determination of whether appropriate action has been achieved. *Id.* at 13. In other words, a particular level of funding does not in and of itself constitute appropriate action under this analysis. *Id.* at 18. In *Horne*, however, the Court did not decide whether appropriate action had been taken, but instead remanded the matter for the District Court to determine whether the

petitioners should be granted relief, in accordance with the standards articulated by the Supreme Court. *Id.* at 36.[3]

This case does not involve a Rule 60(b)(5) motion nor a claim under the EEOA. In contrast, the focus in this case is whether the Board has complied in good faith with the decree to achieve unitary status. *See Bd. Of Educ. of Oklahoma City Public Sch. v. Dowell,* 498 U.S. 237, 247-50 (1991) (establishing the test for determining whether a school district has achieved unitary status). Unfortunately, the recent Unitary Status Hearing revealed that many ELL students were not receiving services they were entitled to and, among other things, that not all teachers had appropriate certification to teach ELL children, facts that even the Board would have a difficult time admitting constitute good faith compliance with the terms of the consent decree. *See* Post Hearing Brief of Amici Curiae (Feb. 20, 2009) (Dkt. # 1339). Although ELL funding and school funding generally have an impact on the delivery of services, the deficiencies raised during the Unitary Status Hearing relate to the Board's overall failure (not just in relation to funding) to deliver services to ELL children.[4]

Finally, the Board's reference to "Sheltered English Immersion" ("SEI") as a favored approach is confusing and takes the *Horne* decision out of context. In *Horne*, at

---

[3] Importantly, the *Horne* Court did note that there "is no question that the goal of the EEOA – overcoming language barriers – is a vitally important one, and our decision will not in any way undermine efforts to achieve that goal." *Horne*, No. 08-289 at 36.

[4] On July 21, 2009, the State Board of Education approved budget cuts, which resulted in bilingual education receiving 25% less in funding than it did in Fiscal Year 2009. *See* Letter from Chris Koch, State Superintendent of Education, to the Illinois General Assembly (Aug. 27, 2009), *available at* http://www.isbe.state.il.us/pdf/ga_budget_ltr.pdf (Ex. B). However, on July 31, 2009 the Governor restored some funding for bilingual education. *Id.* In Fiscal Year 2009, the budget for bilingual education for Chicago was $75,652,000. *Id.* After the Governor's restoration of funding, the budget for Fiscal Year 2010 is $68,086,000 which is, approximately, a 10% cut in funding. *Id.* The Chicago Public Schools will now receive less in reimbursements from the state for bilingual education, which may impact the delivery of bilingual services.

the time of the original declaratory judgment, the Nogales Unified School District's ELL education program was based primarily on bilingual education. *Horne*, No. 08-289 at 23. In 2000, Arizona voters passed Proposition 203, mandating statewide (including Nogales) implementation of a SEI program. *Id.* In light of this changed circumstance, the Supreme Court held that a proper 60(b)(5) analysis "should include further factual findings regarding whether Nogales' implementation of SEI methodology…constitutes a 'significantly changed circumstance[.]'" *Id.* at 24-25. The Court was not expressing a preference for SEI, and even if it was, this is a factually distinct situation than the current state of bilingual education in Illinois.

### III. The Board's Obligation To Comply With No Child Left Behind Legislation Does Not Obviate Its Obligations Under The SACD

The Board notes in its filing that "while compliance with the federal *No Child Left Behind* (NCLB) legislation was not *per se* compliance with the EEOA [in *Horne*], the passage of NCLB was probative of the issue of continued viability of the order at issue." Def. Supp. Br. at 4. In support of this argument, the Board states that based on the *Horne* decision "there is no need for this multiplicity of regulation [.]" *Id.* at 5.

Again, because the facts and procedural posture of this case are completely distinct, the Board's analysis misconstrues the discussion of NCLB in *Horne*. While the Court in *Horne* indicated that the NCLB may have some relevance as a changed circumstance in the context of a Rule 60(b)(5) motion, it is neither controlling nor dispositive of the question of compliance under the EEOA. Here, the Board has not asserted a "changed circumstance" and, again, this case does not implicate the EEOA.

Moreover, the *Horne* decision did not discuss duplicity of regulation, but in fact stated "[a]pproval of a NCLB plan does not entail substantive review of a State's ELL

programming or a determination that the programming results in equal educational opportunity for ELL students." *Horne*, No. 08-289 at 26. Simply because the Board is subject to regulation by two federal authorities does not make it duplicative, as the Board suggests, particularly since, as the Supreme Court made clear in *Horne*, the requirements under NCLB differ from those under the EEOA.

## IV. This Court Should Deny the Board's Motion for Unitary Status Due to Unresolved Issues Related to MGSE Schools

*Amici* urge this Court to deny the Board's motion for unitary status in light of recent events related to admissions to MGSE schools. The Board has not shown that it is in compliance with the SACD provisions for admission to MGSE schools[5] nor proposed a sufficiently definite plan for how it will handle admissions to these schools and student transfers once the district has been granted unitary status. Moreover, the Board has failed to convene public meetings around a proposed future admissions plan or to allow for a period for public comment on proposed plans, as promised by the Board during the Unitary Status Hearing and in the Board's post-hearing brief last February. *See, e.g.*, Def. Bd. of Educ. of the City of Chicago's Post-Unitary Status Hearing Br. at 16 (citing CPS Chief Education Officer Barbara Eason-Watkins' testimony that a new plan would involve significant public feedback) (Dkt. # 1337-1). There is no evidence that any such plan has been developed or that critical input from the community has been sought. Further, the Board is currently under investigation by a federal grand jury examining how students are chosen for admission to some of CPS' top performing schools, namely the nine selective enrollment schools that currently are governed by provisions of the SACD

_____

[5] The Board's own data presented at the Unitary Status Hearing shows noncompliance in 2008 with race-based admissions guidelines to MGSE schools, e.g., Hawthorne, Northside CPHS and Payton CPHS. *See* Def.'s Ex. 51 at 95-97.

that require the use of race-conscious student assignment policies to maintain enrollments of 15% to 35% white students and 65% to 85% students of color.  SACD ¶ I.B.

### A.  The Board Has Failed to Present a Plan for Future Admissions to MGSE Schools

At the Unitary Status Hearing, the Board presented expert testimony that supported the Board's aim to develop a plan for admissions to MGSE schools that would consider the use of socioeconomic status ("SES") as a controlling factor, disposing of the current use of race-conscious admissions policies under the SACD.  The Board made it evident throughout the hearing and in its post-hearing brief that there would be ample opportunity for significant public feedback on the new plan.  The Board's SES expert Richard Kahlenberg testified that after working with CPS to make recommendations and identify a set of options for a SES-based admissions plan, the plan would enter a public phase.  (Test. of Richard Kahlenberg, Jan. 28, 2009).  Chief Education Officer Barbara Eason-Watkins testified that if the desegregation portion of the decree were to be lifted, CPS would conduct a comprehensive process that would take several months and include public feedback from all stakeholders in crafting a plan for moving forward.  (Test. of Eason-Watkins, Feb. 2, 2009).  As of today's date, *Amici* are not aware of any such public process or scheduled public meetings, or even of a proposed future admissions plan.  In addition to a period for public comment for the new plan, the proposed use of SES factors in an admissions plan must be examined by the Court to ensure that "race-neutral" measures that can be a proxy for race are not used to discriminate in the future.

### B.  Federal Investigation of Admissions to Selective Enrollment Schools

As noted, the Board has not demonstrated compliance with the guidelines of the SACD with respect to admissions to MGSE schools, which has led to a great deal of

skepticism by members of the community who believe that without federal court oversight, the admissions practices will effectively maintain desegregated schools.[6] Contributing to the skepticism is the recent federal investigation into admissions practices at the City's nine selective enrollment schools. Just last school year, principals at these nine high schools were formally given the authority to select up to five percent of incoming students, taking into consideration circumstances such as achievement in extracurricular activities, leadership, family hardship, or whether a sibling attends the school, whereas the other 95 percent of students are admitted based on a cumulative score reflecting middle school test scores, elementary school grades, attendance and an entrance exam. The Chicago Sun-Times reported that 16 percent of the 129 students (21 students) selected by principals last year at seven of the nine selective enrollment schools did not pass initial law department scrutiny--for example, some of those students had not taken the requisite entrance exam or had not filled out an admissions application. Fran Spelman, *CPS President Subpoenaed*, Chicago Sun-Times, Aug. 5, 2009, *available at* http://www.suntimes.com/news/cityhall/1701321,CST-NWS-skul05.article (Ex. C). While the racial and ethnic breakdown of those 129 students is unknown, the lack of transparency in the discretionary principal selection process that led to the federal investigation casts doubt in the hearts of many community members and parents who desperately want their children to attend these top-notch schools.

Until the Board proposes a future admissions plan allowing for a period of public comment and until the pending federal investigation is completed (or the Board ensures

---

[6] There is a perception among community members that the Board does not follow the SACD even with federal court oversight. For example, at the hearing on January 22, 2009, Wanda Hopkins of Parents United for Responsible Education ("PURE") stated that "the Board cannot be trusted." On January 23, 2009, Nelly Aguilar, the parent of child enrolled at CPS, stated she was "concerned CPS will operate with little accountability" once the decree is lifted.

this Court that racial disparities have not resulted from these new admissions rules), *Amici* urge this Court to deny the Board's motion for unitary status.

## CONCLUSION

*Amici* respectfully request, in conjunction with its Post-Unitary Status Hearing Brief filed February 20, 2009, that this Court deny unitary status to Defendant Board and refrain from vacating AAC of the SACD. The Board has not complied in good faith with implementing the provisions of the decree in regards to ELL services, and it has neglected to develop a definite post-unitary plan for student admissions to MSGE schools.

DATED: September 3, 2009

Respectfully submitted:

____/s/ Ricardo Meza_____
*Counsel for amici curiae*

HARVEY GROSSMAN
LORI N. TURNER
Roger Baldwin Foundation of ACLU, Inc.
180 N. Michigan Avenue, Suite 2300
Chicago, Illinois 60601
(312) 201-9740
(312) 288-5225 fax

CLYDE E. MURPHY
Chicago Lawyers Committee for
Civil Rights Under Law, Inc.
100 N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 630-9744
(312) 630-1127 fax

RICARDO MEZA
ANITA MADDALI
Mexican American Legal Defense and
Educational Fund
11 E. Adams Street, Suite 700
Chicago, Illinois 60603
(312) 427-0701
(312) 427-0691 fax

**Certificate of Service**

I, Anita Maddali, an attorney for the Plaintiffs, hereby certify that I caused a true and accurate copy of the foregoing **PLAINTIFFS' FED. R. CIV. P. 26(a)(1) INITIAL DISCLOSURES AND FED. R. CIV. P. 26(e) SUPPLEMENTAL DISCLOSURES** to be served upon counsel for defendants and respondents via ECF on September 3, 2009.

11

/s/ Anita Maddali

_____

Anita Maddali