UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 80 C 5124 |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

On September 24, 1980, the United States of America ("United States") filed a lawsuit against the Board of Education of the City of Chicago ("Board") in which it alleged that the Board operated a dual school system that segregated students on the basis of race and ethnic origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Titles IV and VI of the Civil Rights Act of 1964. The Attorney General of the United States certified that the institution of the lawsuit would materially further the orderly achievement of desegregation in the public schools operated by the Board.

The essence of the Board's alleged unlawful conduct was to segregate students on the basis of race and Hispanic ethnic origin by engaging in specific practices which included the following:

(a) the drawing and alteration of school attendance area boundaries in such a way as to create, maintain or increase racial or ethnic segregation of students;

(b) the adjustment of grade structures among schools so as to create or maintain racial or ethnic segregation;

(c) the maintenance of racially and ethnically segregated branches of schools;

(d) the placement of permanent and temporary facilities to relieve student overcrowding and the failure to use alternative, educationally sound measures to relieve student overcrowding so that, by action and omission, racial and ethnic segregation of students was created and maintained;

(e) The maintenance of a racially disproportionate number of severely overcrowded and thereby educationally inferior schools in such a way as to identify, in conjunction with the practices described in the next two subparagraphs, those schools as intended for black students and less crowded schools as intended for white students;

(f) The assignment of teachers and staff to schools in such a way as to match the race of the faculties with the race of the students attending the schools;

(g) The employment of a permissive transfer policy which allowed white students to avoid attending their schools of assignment when their race was in the minority in favor of attendance at other schools where their race constituted the majority of student enrollment; and

(h) the association of segregated schools with segregated housing projects.

It was further alleged that the practices listed above occurred over a substantial period of time and in a substantial portion of the Chicago public schools and constituted a system-wide violation of the Constitution and the laws of the United States. In seeking relief from this Court, the United States claimed that unless restrained, the Board of Education would continue to maintain and operate the Chicago public schools in violation of the Constitution and laws of the United States,

resulting in immediate, severe and irreparable harm. The United States requested that this Court enjoin the Board, its agents, employees and all persons in active concert or participation with it from discriminating against pupils on the basis of race and ethnic origin and from failing to operate said school system lawfully, by implementing such plan of desegregation as this Court may order.

Prior to the filing of the lawsuit, the United States and the Board had engaged in substantive discussions for the purpose of terminating the proceedings without a trial and with the Board amending its practices so as to conform with the Constitution and federal law in the particulars cited in the complaint. As a result of the efforts of the parties, a Consent Decree was entered in the case resolving the Government's allegations and committing the Board to desegregate as many schools as possible considering all the circumstances in Chicago and to provide supplemental programs for any black or Hispanic schools remaining segregated.

For more than twenty years the Board was dutiful in its commitment. The Board filed annual reports with the Court detailing the Board's desegregation actions, the integration of school-based faculty, and the remediation of other practices necessary to satisfying its commitment. The United States never challenged or complained about the Board's efforts to bring about change, the efficacy of its actions, or the good faith with which it was operating.

In the year 2003, some twenty-three years into the decree, this Court summoned the parties and posed the question of whether the decree was outdated and had outlived its usefulness. The inquiry was based on the material changes in the City's demographics and the student population when viewed in racial and ethnic terms, in addition to the remediation efforts of the Board over the years. Validating the inquiry was the twenty plus years of the Board's commitment to the decree and the many changes it inspired, including school-based faculty integration. In 1980, the Board's student population was approximately 18% white, 60% African American, and 14% Hispanic. Today, those numbers are approximately 8% white, 47% African American, and 39% Hispanic.

In addition to the materially changed demographics, the Board underwent a statutorily mandated change in the manner in which it was structured and operated. Simply put, major reforms were enacted, resulting in the creation of Local School Councils which were to govern school-based decisions, including the selection of principals. Principals, in turn, were vested with the power and autonomy to hire teachers. The Board's centralized authority to impose changes consistent with the decree was made much more difficult and complicated. Nevertheless, no complaints were registered by the United States that the reform legislation compromised

compliance with the decree or that other failings on the part of the Board were taking place.

In late 2003, the parties agreed to enter into a modified version of the Consent Decree. The belief of the parties, shared by the Court, was that the Modified Consent Decree ("MCD"), would bring "an effective and orderly resolution" of the case. In early summer of 2006, a hearing was set to reconsider the termination of the MCD. Around the same time, however, the Supreme Court of the United States had before it school cases from Seattle, Washington, and Louisville, Kentucky, both involving race-based admission issues which would, almost certainly, impact the Board's race-based Magnet and Selective Enrollment Schools and practices. It was agreed that prudence dictated that a hearing on termination of the MCD be postponed for a brief period in order to assess the impact of the forthcoming Supreme Court decisions in all pending school cases involving race and related topics. A Second Amended Consent Decree was agreed to by the parties reflecting a few changes but which, significantly, would expire of its own accord one year from the date of entry.

On August 10, 2006, the Court disagreed with the parties that the Decree would automatically expire of its own accord one year after the entry date. The basis for the Court's rejection of this provision was that the parties could not assume for themselves the exclusive province of when and under what circumstances a non-

contested consent decree would terminate. Consent decrees approved and entered by federal judges are more than bilateral contract provisions affecting only the rights and obligations of the signatory parties. While important and helpful, the termination of a consent decree, particularly one that affects the rights and obligations of citizens at large, requires the independent evaluation and judgment of the court in which the decree has been entered after an opportunity to be heard has been afforded by those who may be affected by its termination.

In addition to rejecting the automatic sunset provision agreed to by the parties, this Court vacated the Modified Consent Decree and entered the Second Amended Consent Decree on terms which had been negotiated by the parties. Included within that decree were provisions regarding English Language Learner ("ELL") program services. Notwithstanding the uncertainty in the legal landscape concerning school admission policies and the role of race therein, the question of whether even the Second Amended Consent Decree negotiated by the parties had continued vitality in light of the existing circumstances of the City of Chicago was still relevant. As a consequence, the Court decided to schedule a hearing for the purpose of taking evidence from the parties, Amici Curiae, and members of the public at large for the purpose of determining whether the Second Amended Consent Decree should be terminated.

The early constitutional jurisprudence dealing with public school practices and the role of race within those practices addressed questions of whether the school system operated in dual ways, that is to say, whether students who are in the majority (generally referencing white students) were the beneficiaries of practices and policies which resulted in greater resources and advantages as compared to those made available to minority students (generally referencing black students). In addition to the actual segregation of students, the decided cases portray a variety of ways in which minorities were subjected to inferior opportunities to succeed in school so as to violate the equal protection clause of the Fourteenth Amendment to the Constitution. Consequently, in order to achieve unitary status, it was necessary to show there was no duality in the treatment of students in a school system with one identifiable group favored and one or more disfavored.

In order to achieve unitary status, the Board must demonstrate that (1) it has complied in good faith with the consent decree or court orders over a reasonable period of time; (2) eliminated all vestiges of segregation "to the extent practicable;" and (3) demonstrated its good faith commitment to the constitutional rights that were the predicate for judicial intervention. *Freeman v. Pitts*, 503 U.S. 467, 491-92 (1992); *Dowell v. Board of Education of Oklahoma City Public Schools*, 489 U.S. 237, 248-50 (1991). "A history of good-faith compliance is evidence that any current racial

imbalance is not the product of a new *de jure* violation . . . ." *Freeman*, 503 U.S. at 498.

Notwithstanding the United States' prior willingness to allow the Modified Consent Decree to terminate by agreement and its apparent acquiescence to the Board's annual reports of compliance for over twenty years, it is the present position of the United States that unitary status has not been achieved and that the Second Amended Consent Decree should remain in effect. The evidentiary hearing which took place from January 22, 2009, through February 6, 2009, saw the United States urge that unitary status has not yet been achieved and focused most of its opposition to the Board's ELL programs. Indeed, in its Post-Trial Brief, ten of the brief's fifteen pages are devoted to the Board's perceived deficiencies in various aspects of the ELL policies and programs.

This shift in the legal position of the United States is all the more unusual in the absence of any allegation in any federal complaint that the conduct of the ELL program implicates a federal constitutional interest or that federal law has been violated in the effectuation of the Board's ELL policies. Additionally, a comparison of Amended Appendix C ("AAC") to the Second Amended Consent Decree which contains the ELL provisions reflects substantial similarities with state law requirements. The evidence at the hearing buttressed that conclusion. In response

to questions as to the need for duplicate legal requirements covering the same subject matter, the United States asserts that state officials are less than vigorous in addressing the Board's noncompliance in this area while suggesting it is much more vigorous in its oversight and enforcement functions. This claim rings hollow in the face of its years of silence about ELL matters and its recent willingness to agree to the termination of the operative decree.

During the hearing, a few public witnesses offered their observations of some magnet schools and rendered their non-expert opinions with respect to one or two magnet schools in particular. The Board responded with an abundance of publicly available information and evidence about magnet and selective enrollment schools' admission processes in opposition to the isolated comments of the public witnesses. Despite difficulties in achieving then acceptable racial and ethnic balances in these highly desired schools, the United States and some Amici call for this Court to require the Board to file a proposal regarding how it intends to operate the magnet and selective enrollment schools as a pre-condition to the termination of the present decree.

As described in *People Who Care v. Rockford Bd. of Educ.*, 246 F.3d 1073, 1076 (7th Cir. 2001), "the purpose of a school desegregation decree is to eliminate the consequences of segregation. When they have been eliminated the decree has

done its job and should be lifted." The other fallacy of the Government's position seeking a plan in order to assess future good faith on the part of the Board is its presumed necessity. There is ample evidence in this record of substantial and material changes in the Board's structure and method of operation to permit confidence about future lawful compliance.

We start with the position of the United States already described: for over twenty years, it was accepting of the Board's professed compliance with the objects to be achieved as set out in the original decree and the actions undertaken thereunder without lodging a single complaint to the annual reports submitted to this Court. Additionally, there exists evidence of the longstanding, diverse racial make-up of the Board itself—now comprised completely by minority members—and of the central office executive staff. The appointment of Dr. Barbara Eason-Watkins, an African-American woman, as Chief Education Officer in August 2001 endowed her with the responsibility for curriculum design and support supervision of all elementary schools in the system.

When the Court entered its August 10, 2006, Order vacating the Modified Consent Decree, the Board effectively achieved unitary status as to a significant number of the desegregation consent decree obligations, including faculty integration, extra-curricular activities, facilities, and overarching budget considerations. *See*

*Freeman*, 503 U.S. at 471 (recognizing that a school district may be held partially unitary by a court); *see also Dowell*, 498 U.S. at 250, *citing Green v. County School Board of New Kent County*, 391 U.S. 430, 435 (1968) (in determining unitary status a district court must consider what have become known as the *Green* factors: student assignment; faculty and staff; transportation; extracurricular activities; and facilities). Hence, the only factors presently before the Court for consideration of full and complete unitary status are the limited student assignment, transportation, and school-based administrator provisions of the SACD.

The United States did not present any affirmative evidence during the hearing to dispute that the Board has achieved unitary status. Indeed, during closing arguments, counsel for the United States effectively conceded the appropriateness of a complete unitary status finding, stating: "[F]rom our standpoint, basically, with respect to the desegregation aspect, we should be looking forward and we believe that the District should come in with a plan so that the court can assess good faith." (Tr. at 2235, ll. 17-20). The Seventh Circuit has rejected the United States' and Amici's proposition that a good-faith determination consistent with *Freeman* and *Dowell* requires the presentation of a detailed plan for future district operations, notwithstanding a determination of good faith compliance with decree provisions and the elimination of vestiges of discrimination to the extent practicable. *See People*

*Who Care*, 246 F.3d at 1078.  Rather, the remedy for Equal Protection violations after a district is returned to unitary status is a new legal challenge based on the new alleged violations.  *See id.*[1]

The United States' position that the Board's alleged deficiencies in the structure and implementation of ELL programs and practices are, standing alone, sufficient to defeat present termination of the Second Amended Consent Decree is a dubious proposition both legally and factually.  Indeed, the Board claims that this Court has no federal jurisdiction upon which to continue the decree.

Notwithstanding the Board's prior willingness to agree to ELL provisions being included in the Second Amended Consent Decree, the Board now claims that any ELL provisions claimed to have been violated do not enjoy Constitutional or statutory protection. The extension of the Board's argument is that jurisdiction cannot be bestowed upon this Court by acquiescence or invitation.

The Supreme Court of the United States has yet to directly address Constitutional or federal statutory issues involving a school district's ELL programs. The legal landscape is not barren on the topic, however.  The most recent decision by

---

[1]The United States, like the ACLU during closing argument, relies on a district court case from Arizona, *Fisher v. Lohr,* 821 F. Supp. 1342 (D. Ariz. 1993), but does not address or even mention *People Who Care*, the controlling Seventh Circuit authority.

the United States Supreme Court bears on some of the issues present in the instant case. On June 25, 2009, the Supreme Court decided the case of *Horne v. Flores*, — U.S.—, 129 S. Ct. 2579, with the majority opinion written by Justice Alito. The case originated in Arizona and involved an attempt by the Arizona superintendent of public instruction to vacate an order requiring the Nogales school district to increase funding for bilingual education. The substantive issues dealt with the provisions of the Equal Educational Opportunity Act of 1974. 20 U.S.C. § 1703(f).

The Supreme Court reversed and remanded a decision of the Ninth Circuit Court of Appeals, which had denied a Rule 60(b)(5) motion brought by the Arizona superintendent. Although the Court's principal discussion focused on procedural Rule 60(b)(5), the Court's discussion necessarily implicated institutional reform legislation not dissimilar to the substantive law governing the present case.

The Board's position is that its ELL provisions lack a federal jurisdictional base because the Board's bilingual education program does not involve a federal interest articulated in the Complaint in this case under either the Constitution or any federal statute. The *Horne* majority opinion reads, in part, as follows:

> 'If [a federal consent decree] is not limited to reasonable and necessary implementations of federal law,' it may 'improperly deprive future officials of their designated legislative and executive powers.'

*Horne*, 129 S. Ct. at 2595, *quoting Frew v. Hawkins*, 540 U.S. 431, 441 (2004).

The Board cites the case of *O'Sullivan v. City of Chicago*, 396 F.3d 843, 863 (7th Cir. 2005) for the proposition that absent a federal claim, a "consent decree is no more than a contract, whose enforcement cannot be supported by diversity jurisdiction and that has in court no more force than it would outside of the court." The *Horne* opinion describes the vice of a consent decree lacking a substantial claim under federal law:

> And by requiring petitioners to demonstrate 'appropriate action' through a particular funding mechanism, the Court of Appeals improperly substituted its own education and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted.

*Horne*, 129 S. Ct. at 2597.

Notwithstanding the Supreme Court's holding in *Horne* that federal decrees cannot lawfully be aimed at eliminating conditions that do not violate or flow from a violation of federal law, *id.* at 2595, the United States argues that the quoted language applies to court-ordered decrees, not consent decrees. The *Horne* opinion makes no distinction between court-ordered or consent decrees. The United States seems to suggest that violation of federal law is irrelevant when it argues that a federal court may approve a consent decree that "provides broader relief than the court could have awarded at trial," citing *Local No. 93, Int'l Ass'n of Firefighters v.*

- 14 -

*City of Cleveland*, 478 U.S. 501, 525 (1986) for that proposition. What the Government's position ignores is the following language from *Firefighters* preceding the portion quoted by it:

> Accordingly, a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction. Furthermore, consistent with this requirement, the consent decree must come within the general scope of the case made by the pleadings and must further the objectives of the law upon which the complaint was based.

*Id.* (internal citations and quotation marks omitted).

The challenge to this Court's jurisdiction also finds support in the opinion in *Keyes v. Sch. Dist. No. 1, Denver, Colorado*, 521 F.2d 465 (10th Cir. 1975). That case, like this one, dealt with, among other things, the policy of the state of Colorado in the development of bilingual skills in school districts and the transition of non-English speaking students to English. In its discussion of the alternative school plans to effectuate the transition, this is what the Tenth Circuit had to say in its rejection of the plan adopted in the district court:

> The clear implication of arguments in support of the court's adoption of the Cardenas Plan is that minority students are entitled under the fourteenth amendment to an educational experience tailored to their unique cultural and developmental needs. Although enlightened educational theory may well demand as much, the Constitution does not. In *San Antonio Independent School District v. Rodriguez*, the Supreme Court held that education is not a

right protected by the Constitution except, perhaps, insofar as some minimal quantum of education may be necessary to enable the exercise of the basic rights of speech and voting. Of course, where the state has undertaken to provide an education to its citizens, it must be made available to all on equal terms. But the plaintiffs and intervenor in the present case argue for a right to differential treatment of minority children in the education process. As the Court stated in *Rodriguez*:

> (E)very reform that benefits some more than others may be criticized for what it fails to accomplish. But we think it plain that, in substance, the thrust of the (state's education) system is affirmative and reformatory and, therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts . . . .

Thus we refuse to affirm the court's adoption of the Cardenas Plan on the second ground urged by the parties, that is, that the school's alleged failure to adapt to the cultural and economic needs of minority students amounts to a violation of the fourteenth amendment.

*Id*. at 482-83 (internal citations omitted).

During the hearing, the Board presented overwhelming evidence regarding its exponentially growing budget constraints and significant racial shifts in the district's student and teacher populations over the past twenty-odd years. Additionally, the Board presented evidence of the longstanding, diverse racial make-up of the Board itself (presently comprised completely by minority members) and the central office top executive staff. Against this backdrop, the Board also presented compelling

evidence of its institutionalized efforts to maintain magnet and selective enrollment schools' admissions processes to advance the racial goals under the consent decree; to attract and retain the most qualified and diverse pool of principals and teaching staff available; to consistently provide innovative supplemental educational programs in non-magnet/non-selective schools, a majority of which enroll the district's 92% minority student population[2]; to expand magnet programs and schools in underserved areas of the City; and to construct and/or renovate schools and to implement racial diversity considerations in drawing attendance boundaries for new neighborhood schools. This unchallenged evidence establishes a continued commitment to diverse student assignments to the extent that the law permits.

As the Seventh Circuit noted in *People Who Care*, those objecting to an unconditional unitary finding may not rely on speculation, fear, or distrust. 246 F.3d at 1075. Instead, a party opposing a finding of unitary status must do more than object—it must produce credible evidence that any alleged lingering effects of prior

---

[2] Board Trial Exhibit 7, sponsored by Dr. Eason-Watkins (Tr. at 1373-74), and admitted into evidence without objection, reflects 2009 Fiscal Year (FY09) supplemental funding in Racially Identifiable (RI) elementary schools in a total amount of $578,105,966.00 (Exh. 7 at CPS00015293) and FY09 supplemental funding in RI high schools in a total amount of $188,526,334.00 (*Id*. at CPS00015296). Inadvertently, Dr. Eason-Watkins' trial testimony totaled only the RI high schools' FY09 supplemental funding (Tr. at 1373-74, ll. 12-15). It is clear, however, from Exhibit 7 that the full and complete FY09 supplemental funding across RI elementary and high schools is $766,632,300.00.

discrimination are caused by current discriminatory practices. *See id.* at 1076 (noting that the plaintiffs' brief cited no evidence of vestiges or unlawful discrimination to eliminate). "'At some point,' moreover, 'the continuing and ineliminable traces of an earlier violation are too slight to justify continued federal judicial control of public education.'" *Id*. (citation omitted). Such evidence has not been presented here. The time has arrived for termination of federal judicial control of the Board's operations. The Board has achieved unitary status under the standards articulated in *Freeman* and *Dowell*, and as set forth by the Seventh Circuit Court of Appeals in *People Who Care*.

There is no federal interest articulated in the Complaint filed in this case under the Constitution or any federal statute as to the Board's bilingual education program.[3] The absence of a substantial federal interest is the death knell of AAC. *Evans v. City of Chicago*, 10 F.3d 474, 481 (7th Cir. 1993).

It is perhaps telling that the United States has abandoned any argument that the goals established in the original consent decree have not been achieved. Indeed, the main focus of the Government's challenge to the unitary status finding is the claimed failures of the Board's ELL programs. Much of the evidentiary hearing was

---

[3] Nor was the Complaint ever amended in the more than twenty-eight years since it was filed, even after the Board brought this deficiency to the Court's attention in its April 25, 2008, Memorandum in Support of the Board's Motion to Vacate Section IV and Amended Appendix C of the Second Amended Consent Decree. (Doc. 1262 at 10-11).

consumed with the nature and breadth of ELL and bilingual services. As the Board asserts, somehow bilingual and ELL programs have now morphed into being the predominant issue in the case.

The 1980 Complaint did not contain a single allegation related to bilingual education or ELL program services. At no point during the hearing did the United States dispute that the Board met its obligations under the Original Decree for more than twenty years without question or intervention from the Government. The annual reports filed by the Board with this Court reflected the activities of all of its students, including those for whom English was not their first language. The Board's ongoing bilingual education program was never the subject of comment from the United States. The first time ELL programs became a focal point of this lawsuit was in 2003, as part of the Modified Consent Decree. The modification was inspired by the need to work toward an effective and orderly resolution of the lawsuit, and the Modified Consent Decree was a step toward that end.

As described previously, the next step toward an orderly resolution of the lawsuit took place in 2006, resulting in the contemplation that the dissolution of the Second Amended Consent Decree (the Modified Consent Decree was vacated at that time) was clearly on the horizon but one which the parties could not voluntarily bring about by themselves. Provisions regarding ELL services were included in the Second

Amended Consent Decree by agreement of the parties. The present basis on which the United States now relies to support its contention that unitary status has not yet been reached made its entry twenty-three years into an existing decree and in contemplation of an orderly and effective resolution of the lawsuit.

The implied claims that deficiencies in ELL program services are themselves constitutional or federal law violations has not previously been challenged by the Board in this case or otherwise determined as such by this Court. The Board's posture in this regard is not surprising, given the reasonable sense that we were all approaching the end of this case. A devotion of precious resources by the Board to start a new fight with the United States would be foolish. The Board has raised in its current papers the Court's subject matter jurisdiction over issues related to ELL practices and it is therefore incumbent on the Court's part to address the issue.

In addition to its jurisdictional challenge, the Board asserts that there is no evidentiary basis to support a factual finding that termination of the decree is not appropriate. While it is true that the United States did not offer any affirmative evidence during the hearing to dispute that the Board has achieved unitary status, the focus of its attack is on claimed deficiencies in the structure and implementation of ELL programs and practices. Some perspective is necessary in order to appreciate the scope and magnitude of the Board's mission.

Residents of Chicago are rightfully proud of their city. It has many virtues, from the lake, to its architecture, to its Midwestern charm, to the warmth of its people, and its enormous ethnic diversity. But it is that ethnic diversity, coupled with the continuing influx of new residents from countries throughout the world, that creates enormous complexities in educating students whose first language is not English. There is opinion evidence in the record that the Board and its ELL programs have to deal with nearly ninety non-English native languages reflecting a multitude of racial and ethnic groups. The resources necessary to do so, whether human, fiscal, or programmatic are profound and, not surprisingly, often in short supply.

The thrust of the United States' opposition to termination of the Second Amended Consent Decree is a variety of shortcomings described in various aspects of the program. The criticisms include the following:

(a) greater resources needed for oversight staff;
(b) clearer forms to be used;
(c) greater accountability by principals;
(d) more and better bilingual books and other materials;
(e) more certified bilingual teachers in a variety of native languages; and
(f) better documentation of problems.

The United States proffered two independent experts at the hearing, and it is their testimony that the United States principally relies on in its delineation of the Board's shortcomings. Unlike lay witnesses who are generally not permitted to offer

opinions or conclusions while testifying, the Federal Rules of Evidence permit witnesses to give their expert opinions on matters in which their expertise is satisfactorily established in accordance with law.  Fed. R. Evid. 702.  In addition to expertise, Rule 702 requires that the testimony is the product of reliable principles and methods and that the witness has applied the principles and methods reliably to the facts of the case.

One of the bases for these requirements is the reasonable expectation that the witness will maintain allegiance to the principles of his or her discipline and not foresake those principles just because of the adversary nature of the proceeding. Stated simply, objectivity and fairness called for by the circumstances must not be abandoned in an effort to bring about a desired result.

Interestingly enough, each of the two government experts used similar protocols in preparing for their own site visits to various schools.  Each expert separated compliance or technical assistance reports on schools into three piles.  One pile reflected schools with a history of satisfactory reports, another pile reflected schools with a few issues, and the third pile reflected schools with many issues.

Out of thirty-two schools visited by one of the experts, only two were schools from the satisfactory pile.  In the worksheet notes, this witness candidly wrote that she looked for "real losers."

The other government expert also acknowledged that she picked schools where she knew there would be problems. She testified to not being a statistical expert and did not do anything along those lines in her site selection choices or in the projection of her observations districtwide. This expert never visited a non-problem school.

When asked why she did not include a positive report in a school which warranted one, the expert said, "It didn't seem to fit what I was writing about." In this witness's report, she criticized the nature and quality of instruction in an observed classroom but conceded that she did not supply any objective criteria in her report by which her opinion with regard to adequate or less than adequate instruction could be assessed.

There can be no question that the site visits were the underpinnings for the reports prepared by the government experts and the opinions they sponsored. Neither random selection nor any other objective basis was used in order to gain data necessary to develop an informed, complete, and reliable set of opinions by either of the two proffered experts. The requirement of a reliable principle or method necessary to generate the opinion was ignored in this case. When these shortcomings are coupled with the failure to interview the chief or other responsible officials of the ELL program, any observations and opinions extrapolated to the balance of the

school district must be rejected.  An overseer bent on finding trouble will usually succeed.

The heart of the criticisms directed to the ELL programs and practices is the lack of sufficient resources to achieve a more desirable level of performance.  Indeed, the testimony of one of the government's witnesses confirmed that this is the most important consideration involving the Chicago Public Schools.  On this issue, the language of *Horne* is instructive; the Supreme Court's decision tells us that levels of funding and allocation of resources are not within the province of federal courts to decide or within the powers of federal judges to decree.

The testimony of the government's two experts is, nonetheless, not without some value.  The problems observed clearly existed and both were professional educators seeking to bring about improvements in a vital program.  It is also worth noting their testimony that the Chief Officer of the Office of Language and Culture Education provided able leadership and that the monitoring process has improved under her leadership.  Their personal observations provide a blueprint for continued improvement in all of the Board's bilingual programs.

Dr. Eason-Watkins, Chief Education Officer for the Chicago Public Schools and a professional educator, described the Chicago Public Schools' Education Plan

which sets out a series of goals for the entire school district. The plan's core categories are:

(1)    Instructional Strategy;
(2)    Human Capital Strategy; and
(3)    Expanding Options and Opportunities.

Within each category, Dr. Eason-Watkins discussed various initiatives and their success relative to other districts and other states. She was knowledgeable, thorough, forward-looking, and sensitive to all of the issues facing the Board, including matters of bilingual education. There is no doubt as to her good-faith commitment to the Constitutional rights that were the predicate for judicial intervention and her intolerance for any school district employee who did not share her commitment. Her commitment extends to ELL and bilingual matters.

We recognize the many issues present in operating a school district the size and complexity of Chicago's. Improvements have been made and the vestiges of discrimination are no longer. But we caution the Board not to become sanguine with the outcome reflected in today's decision. The hearing in this case centered on the lawfulness of the Board's present practices. It was not about whether the quality of those educational services was as good as it could be. Perfection may not be achievable, but it must be strived for. A public school system which fails to attract

a significant number of a segment of its population cannot clam bragging rights by virtue of its success in court.

We take this opportunity to extend our thanks to the Amici Curiae for their contributions throughout this lengthy litigation. Their participation was welcome and helpful and contributed to the clarity of the issues.

At the beginning of this hearing, we were graced with the presence of a number of students from Social Justice High School. Most of those students were of Hispanic descent. All testified in open court, led and inspired by their teacher, Mr. Jackson Potter.

Those in attendance could not have failed to be impressed by their presence and their words. Products of bilingual homes and bilingual public education, in many ways their simple eloquence in the English language belied the notion of a second-rate education. The decision announced today was not ordained by their presence or testimony, but the evidentiary concept of probative value received a fresh coat of luster.

The decision in this case should neither denigrate nor diminish those principles which are at the forefront of our nation's governance and in the society of our lives. Although perhaps a cliche, the expression "our children are our future" is neither trite

nor unworthy of devotion. The educational opportunities we provide for them and the achievements they realize will in no small measure decree the future of our nation.

Resources devoted to the enrichment of a child's mind and welfare have much to say about the values we hold dear and which we implore other countries to share. There is no substitute for learning, and teachers and school officials everywhere who strive daily to bring about the reality of our commitment are deserving of our acknowledgment and praise. We offer it here.

In summary, the evidence establishes overwhelmingly that the Second Amended Consent Decree and the two decrees which preceded it have outlived their useful lives. Aside from its tenuous jurisdictional basis in this Court, a hearing consumed by evidence about conduct which has never been charged in the only operative complaint is a late and ill-fitting addition to any controversy between the parties. The original allegations of the complaint have long since disappeared for one reason or another. To bring an entirely different subject forward for resolution, lacking in specific allegations or precise violations, lacking in settled standards of conduct or practices by which to measure compliance, was ill-advised. State law already governs bilingual and ELL programs; AAC of the Second Amended Consent Decree, in its essential provisions, mimics the state regulations on the subject. Beyond the dubious jurisdictional predicate relied on by the United States, the

testimony of its experts in the criticisms lodged suffer from the infirmities previously described. Neither expert made a pretense of complying with the requirement that experts employ reliable principles and methods in their studies or inspired confidence that those principles and methods were reliably applied to the facts of the case. Neglecting objectivity and fairness because "it didn't fit" with what was observed or reported about defeats reliability and the ability of a fact-finder to predicate conclusions thereon.

For the reasons described, the Second Amended Consent Decree is hereby terminated and vacated.

Charles P. Kocoras
United States District Judge

Dated:     September 24, 2009